You will hear argument this morning in Case 23-970, NVIDIA v. E. Ohman J. or Fonder AB. Mr. Conteo? Thank you, Mr. Chief Justice, and may it please the Court. The Reform Act's pleading standards are unique. Congress looked at private securities litigation and saw big fishing expeditions in discovery and extortion of settlements. They knew that for centuries heightened pleading had been required, but they supercharged it. First, they required plaintiffs to, quote, state with particularity facts giving rise to a strong inference the defendant acted with scienter, a dramatic break with common law. And second, they required for allegations outside of a plaintiff's personal knowledge, plaintiffs to, quote, state with particularity all the facts on which their belief is formed. This double heightened pleading requirement exists in virtually no other context. Y2K is the lone example, and that is what resolves this case. As our cert petition and the amici explain, the Ninth Circuit's decision creates an easy road map for plaintiffs to evade the Reform Act. When a stock drops, all they have to do is find an expert with numbers that contradict the company's public statements, then allege the company keeps records that executives look at, and then argue those records would have matched the hired expert's numbers. That's a recipe for Judge Friendly's warning of fraud by hindsight. This complaint, which alleges that Jensen Wong made false statements, is a good example. It's a grave accusation against a respected CEO, yet the complaint never shows the scienter to be as cogent and compelling as not. It merely surmises that Wong reviewed internal reports showing a higher quantum of crypto purchases than what he disclosed, yet it never alleges the contents of those reports. And to meet falsity, the complaint relies on an expert opinion with a series of implausible assumptions and inferences, not particularized allegations of fact. Nothing dispels the more compelling explanation that Wong offered at the time. He knew crypto buys were increasing prices, and so he introduced a crypto-specific chip and increased the supply of gaming chips with the hopes that prices would fall. The fact this process took longer than anticipated is not securities fraud. The Ninth Circuit slighted the Act's heightened pleading requirements, and this Court should reverse. I welcome the Court's questions. What would this complaint look like if it had complied with the heightened pleading standards? Yeah, so I think it would have had to allege this complaint is based on internal documents, and so it would have to allege the contents of those documents, and particularly Justice Thomas, for example. It would have to answer what specific data did the CEO actually see? How clear was it? When did he see that data? Was the data generated after his public statements or before? How much does that data deviate from the public statements? Where does that data cover? Is it one country? Is it the world? And, you know, when was that data generated? So, you know, what did the CEO know? When did he know it? I think are the most important questions. And here, when you scratch just below the surface, and this is what Judge Sanchez's dissent, I think, so powerfully did, or the district court did, by going allegation by allegation, it all dissolves. It's certainly a long complaint. I'll spot them that. But it's a long complaint like cotton candy that dissolves after it looks like a lot of volume, but it dissolves. Mr. Katyal, I guess my concern is that you appear to be requiring for plaintiffs to actually have the evidence in order to plead their case. And I didn't understand the pleading standards, even with particularity, to require that they have the documents, nor do I understand how they could have the documents when discovery hasn't occurred yet. So, of course, they do have documents in this very case. Joint Appendix 59 to 62 does provide an internal document. It's a document that entirely backfires on them. No, I understand, but the typical plaintiff in a situation like this, because the company has the documents. Sure. So I just wanted to say factually, of course, the SEC had access to all the documents and never found... Right, but the SEC is not pleading this case. Of course. We have plaintiffs who are bringing these allegations, and you're right that they reference documents, that documents are important to their claim of scienter. But I guess the standard that I hear you wanting us to require would cause them to have to have such level of detail about the contents of the documents that it would seem that they would need to have the documents, right? So, Justice Jackson, we don't think that's right. That's not our legal standard. Our blue brief at page 40 is expressed about that. Our point is that the contents can be met by someone who has the documents or who has personally reviewed those documents and describes them with particularity. And so we'd say look to, for example, the ABC case from the Fifth Circuit. In that case, it said, look, they didn't have the documents, but they had details about the documents. But why are the details necessary in certain cases? I mean, part of my concern is that you seem to be wanting a bright line that says the contents of the documents are necessary. And I can imagine a number of scenarios in which that might not be the case. So we have someone, for example, many employees who are at a board meeting, many board meetings during the relevant period of time. They say memos were circulated with regularity talking about this kind of thing. We can't remember exactly the data points, but the discrepancy between what the CEO was saying publicly and what was appearing in the documents that we were reviewing was glaring. And we remember that and we know that. I don't understand why that's not enough for the pleading stage. Right. So, Justice Jackson, our rule is definitely not that you have to have the documents. And some cases won't need documents at all. So, you know, our brief goes through a lot of real-world examples, like the Glazer case in which the employees say the boss was ordering us to cook the books. Or if you have a circumstance like Stevelman in which a boss is handed a report. We don't know what that report says, but right after the handing of the report, the boss goes and tells the boss. No, no, no. My hypothetical is we do know what it said. We knew what it said at the time, says the employees. What we don't remember for today in this moment, as we are alleging exactly what the data points were, but our testimony is that documents that we saw that had the relevant information were given to the CEO during this meeting at the same time that the CEO was saying something else externally. Yeah. And if those documents- Why do we need the data points is my question. The data is a requirement of what particularity is. And particularity requires, you know, at least a good description of the who, what, where, when, and how. That's what Congress required. And, yes, sometimes you're absolutely right. Mr. Fitzgerald, could I stop you a moment? Tell me what rule you want us to adopt. Yeah. So if a plaintiff is relying on an allegation to show an inference of scienter, it has to be particularized enough to know whether it is truly relevant to establishing scienter. So in a case like that- You know something? It sounds to me, and I am concerned about your cert petition, because you make two allegations in your cert petition. The first one was similar to this, but you said you wanted a bright line rule that you need to have particularized ex-description of the document. That's what you said in your cert petition. But Tillis, our case, alleged that the CEO knew or should have known that the company's internal sales reports were not consistent with his public statements. But they did not allege the precise contents of those reports. We rejected the petitioner's argument there that the plaintiff failed to describe the documents in enough detail. It's an issue of fact. Is there enough detail? Now, you're spotting us that it's a very long complaint. We often don't grant cert to error correct. Is this entire case just an error correction? Are these particular documents not precise enough? I'm not actually sure what rule we could articulate that would be clearer than our cases already say. So absolutely, this is what we don't think is. That's, of course, what my friend on the other side tried to argue. Well, except that I've gone through the complaint, all right? And we have any number of employees, some of them who created the documents, others who were present when the documents were being discussed, others who, only one who wasn't present during the relevant time, but who set up what the creation of the documents showed, and others who were present during the time who said there were many, many crypto sales, many more than the $150 million that your client claimed, and he kept saying that it was a small part of the business, all right? And yet all of these employees are saying, no, it's not a small part of the business. One of them was familiar with China, and it was a huge part of China's business. And others were familiar with Europe. I guess I'm going back to this is pure error correction that you're asking us to do. So, Justice Osamayor, there's a lot there, so I have a lot to say in response. Tell me your rule. So I told you the rule, which is if they are basing their allegations and inferences of scienter on internal documents, they have to disclose those documents with particularity. Now, my friend on the other side in the brief in opposition said that's just fact-bound error correction. This court granted certiorari over that, and I think for good reason. This case is very much like the Twombly case in which Justice Stevens made exactly— No, it's because you told us there was a five-to-two split, and in fact there is no split. None of the cases you cited in the split hold the rule that you're claiming. I think they do, Justice Osamayor. No, two of them, the Second Circuit and the Anderson case, which is the only one in your merits brief that you go through, that case was the court simply saying the witness was talking to us about one thing in the reports but not about the scienter that was necessary for the second thing. If I could contrast the case that I just gave Justice Jackson, the Fifth Circuit decision in ABC, which goes through the long complaint and says at the end of it, 100 pages, 14 confidential witnesses, all of that together doesn't actually state a claim because it's not particularized, and you match that up against the Ninth Circuit, it is as clear as day that these are two very different approaches. This court in Twombly confronted a similar situation in the District Court, dismissed the case for failing to state a claim, the Second Circuit reversed. Justice Stevens made exactly the arguments. You were in dissent, and he said, look, the law is as clear as day, but this court didn't just remand, it reversed and said the Second Circuit was wrong. We need to set a standard for the entire country to avoid lawsuits from going on, and I think Twombly is a very good example of how the court setting that rule matters. This court has never defined particularity since the year 1926. All right, counsel, one last thing on your expert rule. Your expert rule sounds very much like Justice Alito's concurrence. Is it? No, we certainly don't have any objection to Justice Alito's concurrence in Tell Labs, but we don't think, as our reply brief says, it matters here. So, Justice Sotomayor, you were talking about all the employee statements. All the employee statements taken together never get to where they need to go, which is a strong inference that shows that— I'm totally dubious of that, but your other side can give you the factual argument on that, because I've read through the allegations, and the employees were talking about constant sales reports that tracked every item that was being sold, either to a gamer or to a cryptocurrency marketeer. And they were talking about the exact nature of the documents that were being created and the fact that there were many, many more sales than the 150 million that he was claiming. So, Justice Sotomayor, with all respect, the district court went through allegation by allegation of these former employees and decimated each one, showing none of them were particularized. I understand what they've done is throw a bunch of spaghetti at the wall, and it's very hard for me in a half-hour argument to deal with that kind of shell game. One thing that concerns me about both sides' presentation, it's a little black and white. I gather you wouldn't be terribly upset about a complaint with a lot of direct evidence and some expert reports that sort of help shore that up, and I'm assuming the other side would be fine if the balance was the other way. Now, if I think that the positions on both sides are a little too absolute, how do you find sort of the sweet spot in terms of when the PSLRA is satisfied? I mean, it can't be just a little bit of direct evidence because that statute was intended to do something. On the other hand, it seems to me you can't insist on only the direct evidence before a complaint goes forward. So if I don't think it's black and white, how do I decide where the balance is? So, Mr. Chief Justice, I think you need to adopt the rule that's in our brief, which is not that you need direct evidence. Circumstantial evidence can do that just as well. It's just got to be particularized, and at the end of the day, it's got to meet that TELLAB's holistic inquiry in showing SIENTR is at least as cogent and compelling as not. So I think at a minimum, it's going to require what specifically did the CEO know, and when did he know it? This case is a perfect illustration. All the evidence Justice Sotomayor is pointing to is from outside the class period, from before the class period. As our brief explains, in May of 2017, which is the beginning of the class period, that's a watershed moment. Why? Because at that moment, the company introduces a crypto-specific chip, the crypto-SKU, and what their own complaint says, the only time they allege an internal document is at Joint Appendix 59-62, and that document boomerangs on them. It shows once that new chip was introduced, crypto sales to miners, to GPU sales, dropped dramatically, down to 27% from 62%. So the complaint essentially eats itself. This is why particularity is so important, why Congress insisted on it, that when question, because when they have a bunch of allegations from before May of 2017, that tells us nothing about after that. It's kind of like looking at BlackBerry sales data before the introduction of the iPhone and saying, look, we can project BlackBerry sales after the iPhone's introduction. Of course not. The whole thing the company was doing here, they were acknowledging that crypto miners were buying their products. They said, look, we couldn't track exactly how much. They introduced a whole product to deal with that. Their allegation is this CEO lied and lied about the dependence on crypto. I mean, it's a really weird way to lie, to say we're going to introduce a whole new product to deal specifically with this market. Your description and your discussion and your argument sounds to me like summary judgment stage kind of discussion. In other words, you seem to be suggesting that this is the evidence that they have related to your client's misconduct, and it's not enough. And I would appreciate that if we were at the summary judgment stage. What I don't understand is at the pleading stage, the allegations being made, how you are saying what I understood your rule to be, as stated in your question presented, is there the contents of the documents have to be alleged with particularity. And I'm still stuck on that as the only way in which a plaintiff can sufficiently allege. If I enter in this kind of circumstance, I don't know why that is. So, again, it's not the only way. There's lots of ways in which people allege non document cases. So the executive says cook the books. No, I'm saying in a document case, you can have a world in which you're not necessarily quoting from, pointing to the content. And yet your rules suggest that that case would have to be dismissed because it's not particularized. So I'm misunderstanding your rule. You certainly don't need to have the document, quote from the document. You do have to disclose the particulars of what that document says. So can I ask you to give you a couple of hypotheticals to test what that means? First hypothetical, you have a complaint that alleges that on Monday, the CEO tells a few subordinates, I just read this, these internal documents and it looks like sales of our principal product are down. And then on Tuesday, he goes out and tells the public sales of our principal product are up. Is that particularized enough? Yes, you don't need to have the report. That's very much like what happened in TEL Labs on remand, absolutely. Okay, so sort of just a statement, you know, I'm not giving you numbers. I'm not giving you a lot of, you know, this product did one thing and this product did another thing. I'm just saying sales were down, sales were up. I don't think you need quantity. I do think you need to show a deviation, a delta between the public statements and what the CEO knows. Sales were down and he said sales were up. Yeah, so, I mean, down and up, you know, if there's enough gravity, yes, that could stay the claim. Okay, suppose that the document, excuse me, the complaint doesn't have these allegations that he said something about the documents to a bunch of subordinates, but instead he has made the same public statement, sales are up, and the plaintiffs come up with a lot of evidence that shows two things. The first is that he constantly reads documents about sales, all right, and the second is they come up with a lot of sort of outside evidence that sales were in fact down. So they don't have him saying I read the document and the document says X, but there's a lot of evidence that really indicates that the document said X because that's the evidence in the world. Yeah, so again, I think it's what did the CEO know and when did he know it. In your hypothetical, the when question is answered in a way that it's not at all with all the allegations in this case. So we have no idea when the CEO got that information. In your case, I think it's possible to infer based on everything that the CEO might have had access to that information and did it. Here you've got a very different circumstance because you've got a product which is just a component in which they can't track end users. The only allegation that they track end users is that- As I hear what you're saying, you're not really saying that you have to have the contents of those documents as long as what the complaint alleges and plausibly so is that he stares at a lot of documents and the evidence suggests that the documents would have said something that's quite different from what he presents to the public. You've got to describe- That's good for you and that's bad for you. That's not a bright line rule and that's good for you because we don't like bright line rules in this context and have said so a thousand times. But it's bad for you because as what you're saying from the podium in terms of the rule you think we should adopt gets more and more like the sort of thing that we usually ask for, it becomes less and less clear why we took this case, number one, as Justice Sotomayor suggested, and number two, why you should win it. Our rule has always been the same. We've always said it's not a bright line rule, that it's a contextualized rule and one in which you were to ask have the particulars been disclosed. What we're basically seeking is a definition of particularity. In this case that would mean at least answering what that data was that showed a deviation from the CEO's public statements and what he knew and there's nothing even close and the complaint at best just eats itself. So you don't need to ask for evidence as Justice Jackson was saying or anything else. You just need the complaint itself and then ask was any of the allegations showing enough of a delta because this is a quantum case. The company is disclosing all over the place they sell to crypto miners. The question is what the extent of that was and was that something that was a deviation. Why isn't that error correction though? I mean kind of returning to Justice Sotomayor's point, if we think your bright line rule fails for the reasons Justice Kagan is suggesting, why isn't your answer that you're giving Justice Kagan simply asking us to go through the complaint and explain why it's not good enough? We think that it's not error correction because the Ninth Circuit's rule was too loosey-goosey and allowed basically a recipe for fraud by hindsight. But it articulated the rule as we said it in Matrix and Tell Labs. No, I think it didn't articulate the rule. So let me just give you one example. Tell Labs says the key inquiry is a comparative one to look at whether or not their story is as cogent and compelling as any competing inferences. Did the big tell here, did the Ninth Circuit ever even bother engaging in that? No, because there weren't the details that they provided to do so. They did say on that, they did say, Mr. Kotchell, that it beggars belief to think that a CEO would not have been aware of the source of such a large portion of the company's income, especially given the evidence here that this CEO was very interested in sales challenges. So you may disagree with that comparative conclusion, but why isn't that a comparative conclusion? So Justice Gorsuch, four things. We absolutely agree with you. Petition Appendix 55A, that is what the court says, the Ninth Circuit says. They say it's reasonable to infer Wong would review the documents because a CEO who does not know the source of 1.2 billion in revenues is unlikely to exist. There are several things about that. Number one, that never even acknowledges our competing story and our competing inference that the company couldn't track those revenues because that data doesn't exist. That is acknowledged elsewhere in the opinion, and it may be not emphasized enough for your taste and therefore may be wrong as a matter of error correction. But there is a comparative analysis that was performed. And that comparative analysis depends entirely, that number 1.2 comes entirely from that expert prism. Again, it might be wrong, but there's a comparative analysis. Comparative analysis, absolutely. But Justice Gorsuch, it's notable that our brief at pages 45 to 47 describes all of the problems with that report, and they don't even bother, and the government doesn't even bother trying to defend those assumptions. Let me ask you a question on that. Well, I've got you, and I'll let you go. I promise. Do you take the position, Professor Grunfest, that an expert opinion can never be used to help establish particularized facts? No, no, no. We say that expert opinions can't be used to substitute for those facts, which is the rule of the Second and Fifth Circuits, and we think the Court should embrace that rule. So it can be used to supplement them. To supplement. Like any other circumstantial evidence. Yeah, exactly. Yeah, it can be, you know, the facts underlying absolutely can be. Now, to get back to the point about the comparative inference. Thank you, Counsel. I just have one question about an analogy. I've never heard the analogy complaint eats itself. What does that mean? It's very vivid, but I don't know. I'm trying to basically illustrate to Justice Jackson, our rule is not one about evidence. It's rather read the complaint and ask, that telebs inquiry, is it as cogent and compelling as the alternative explanation? Here, the alternative explanation is the company saw the GPU prices were high, and they dealt with it through the introduction of a crypto-specific chip. Prices didn't fall as quickly as they thought. Sometimes that happens in markets where retailers keep prices high. But there's nothing to say that the CEO lied about it. And what I say by eats itself, this is what Judge Sanchez said at page 87A in his dissent. He looked at paragraph 121 in the complaint. And paragraph 121 shows that watershed moment in May of 2017, when the company introduces that new chip, GPU sales to miners fall dramatically. And so if you just read the complaint, it doesn't even state a plausible for 12v6 theory, let alone one that meets the Reform Act, because the Reform Act requires so much more of what Mr. Wong knew and when he knew it. Okay. I'm not sure how that's eating itself, but I'll take it. It destroys itself, whatever word you want to use. Justice Thomas? Justice Alito? Well, let me go back to the PRISM report. Would you dispute the proposition that if the discrepancy between what Mr. Wong stated and the figures in the PRISM report were true, that the inference drawn by the Ninth Circuit would be a legitimate inference at the 12v6 stage? So, Justice Alito, if the report disclosed the methodology, how it got there, as opposed to relying on, quote, proprietary data that they never tell us, and was able to surmount all of the problems, the big, huge gaps in inference that are brief details, like, for example, it treated every increase in processing power as the result of an NVIDIA new chip, as if there was no delay between sales and adding to the network. It didn't treat crypto miners and gamers as different people, and they're often the same. If you jump through all that, yes, we think a report like that could be helpful. But in this case, it's miles and miles away from that. This is a report that, yes, they went to Harvard, but beyond that, I don't think it can tell you very much about the state of reality of the world. Well, I don't really understand how you and perhaps your friend think that reports like this, opinions by experts on a highly technical subject, are supposed to be handled at the 12v6 stage. The facts that Prism relied on are set out with some particularity, are they not? So there are some with some indicia of particularity, but at the end of it, no, because, for example, it relies on a proprietary model they don't even tell us about. Our problem here is not just that we think you can have an expert come in to explain a complicated term or something like that, but this expert was creating an entire economic model to estimate NVIDIA's crypto sales, because that data didn't exist anywhere else. That's what they're paying for. And you claim, and maybe you're right, that the model is flawed, the data is not reliable, but this is a highly technical subject, and I just don't understand how a court is supposed to evaluate that at the pleading stage. You talk about Daubert, but Daubert is not a case that sets out a standard to determine whether a complaint, whether a claim should be dismissed at that stage. So what is the court to do at the pleading stage when it is presented with highly technical information that is beyond the capability of the judge to evaluate at that stage? It's different at that stage than at trial when there's an opportunity to have a cross-examination of the expert, qualify the expert, ask the expert questions. It's a puzzling question to me. So just a little, we think the U.S. government has it right at page 34. The defendants may, quote, challenge an expert's reliance on conclusory speculative premises at the pleading stage. Now, in a case like this, in which it's not that type of such difficult thing for a court to analyze by reading the report and seeing all of the gaps and noting, most tellingly, that they can't even bother trying to defend the analysis of the expert, that's an easy case. In your very complicated technical case in which a court can't evaluate one way or another, we don't have a position on that because that's just miles away from this case. We think you should leave that to one side. Okay. Well, one more question along these lines. You draw a distinction between fact and opinion. But isn't it true that it is a fact that PRISM reached certain conclusions? Is that not a particularized fact? No. We don't think that at least a relevant particularized fact. It's how they got to those conclusions. And the methodology in that report is not disclosed. My friend on the other side says, okay, don't look at PRISM. Look at the RBC report, which is one sentence in their complaint. The Ninth Circuit doesn't rely on it. Nobody does because that doesn't disclose the methodology at all. It's literally one sentence. Thank you. Justice Sotomayor? Justice Kagan? If I understood your answers to Justice Alito, you're not suggesting that there's any special rule relating to expert evidence, expert reports. You're just saying that this was a terribly flawed report. Is that correct?  We're saying you adopt the Second and Fifth Circuit's rule that an expert opinion can't itself substitute for a particularized allegations of fact. You treat it just like the government does, pretend the statement was made by a plaintiff, was made by a plaintiff. I mean, once again, it just seems to me that you're asking us to engage in a kind of analysis that we are not very good at and weren't expecting to when we took this case to decide whether this particular report is flawed or not in the way that you suggest. Justice Kagan, I think our position has been exactly the same in the cert petition, and I think the reason you have to do it in the reverse of the Ninth Circuit is what Judge Sanchez said in dissent, which is, otherwise you've given every plaintiff a how-to roadmap. Hire an expert like this, say it's really complicated along the lines of Justice Alito's question. Do you think that the Royal Bank of Canada report is flawed in the same way? I have no idea, because it's one sentence and doesn't even tell us how it reached anything. I mean, presumably it's out there in the world, right? Presumably you credit the Royal Bank of Canada report, which concluded that NVIDIA understated its crypto-related revenues by more than $1 billion. Yes, so it's one sentence. The report is not one sentence. The analysis is, yeah, there's nothing there. And as Professor Grunfuss says in his brief, it very well may be that this RBC report is relying on the same proprietary data, the petty data, as the PRISM report. It might be double-counting the very same report. And this is why, Justice Kagan, particularity matters. But again, you're not saying that it doesn't go into the mix because it's an expert report in any way. No. It's just like, what was that based on? Is that a good report? Correct. Is the PRISM report a good report? Is any other report that they can come up with a good report? That's what you're asking us to evaluate. I quite agree, except I wouldn't just say good. I would say disclose the particulars, how you got there, and make sure that there aren't unwarranted assumptions. The one thing we know, the PRISM report has a series of unfounded assumptions. Justice Gorsuch? So we've talked about how the case has kind of migrated from the first QP into more fact-intensive questions for us. I'm wondering whether that's after your discussion with Justice Kagan where we are on the second QP, which was whether a plaintiff can satisfy the PLSRA's particularity requirement by relying on an expert report to substitute for particularized allegations of fact. And what I'm hearing today is, well, sometimes an expert report might be able to do that, if it itself is particularized, and this one is not. It's not a categorical rule that expert reports are off the table. It's the same rule, Justice Gorsuch, as in our cert petition, which is that in expert opinions, facts, the underlying facts, can help state a claim, but the very credentials and the fact that an expert offers an opinion cannot. The Ninth Circuit at pages 20 to 23 relied on the expert's credentials to jump past all of the problematic assumptions. I understand your concerns very well with respect to this report, but it does strike me that there's some delta between what you're asking us to do today and what your QP2 says. No, I think it's the same basic point, which is, you know, expert opinions can't substitute for those underlying facts. And we think it's important the Court reach that for the reason Judge Sanchez said, because otherwise this decision is a how-to map. Hire an expert, say that expert's really credentialed, say it's a really complicated issue. No, but if we had a really robust report here that you really couldn't take issue with, that concluded that there were a billion dollars in understated revenues, you're telling us that that report would be okay, and that would be useful for understanding whether Gale's argument is met, right? It's not the details of the report, the fact that it's from an expert, it's the details. If it all added up, 2 plus 2 equaled 4 all the way through the report, and it was rigorous and robust and disclosed, then we would have a claim. So as long as those allegations were available at the time, for example, for the CEO to see, so again, that particularity in this Court insisting on the details and what particularity is so important, that's the legal rule we're asking for. So how would you summarize, then, the analytical or legal mistake that the Ninth Circuit committed that you think would create problems going forward for PSLRA litigation? Yeah, so with respect to Sienter, it blew past what did the CEO know and when he knew it, and it's illustrated by the timing problems in this case. We think you should write an opinion that says particularity requires answering those things, that a series of maybes is not enough, and with respect to expert opinions, the Ninth Circuit allowed an expert's opinion to substitute for particularized allegations of fact, and the legal rule should be an expert's facts can help state a claim, but the fact that something is said by an expert by itself isn't enough. That's what Judge Sanchez isolated in his dissent. That is the two arguments in the cert petition, and what all the amici say you should grant on, they say this is a recurring fact pattern. People across the country, and particularly now in the Ninth Circuit, are using this decision as a roadmap to get around the PLSRA's requirements, and every time a stock price drops, you can make the same kinds of allegations. The CEO must have reviewed these reports. Hire an expert to say it's a massive dollar figure. That can happen in case after case. Judge Friendly's warning, I think, is prophetic. Do you think the Ninth Circuit's different from other circuits, if this opinion were to stand, on how those kinds of cases are treated? Absolutely. That's what our cert petition says. The Ninth Circuit has an outsized influence on these cases just by dint of its size and where companies are located. It's particularly dangerous to let this rule stand there, but we think in general you should issue a rule for the entire country. It's very much, as I was saying earlier, like Twombly. Look, it sounds, I understand there's a whole bunch of facts, just like Twombly. Pages and pages of discussion about ILACs and this and that. But at the end of the day, this court getting into those details and setting a rule for the entire country and giving a concrete example in that case was really important and gave guidance to litigants all across the country. Thank you. Justice Barrett? Justice Jackson? So, Mr. Kretzschel, I am worried about what I see as the delta between what you're asking for here today and what you asked for in your petition and what you argued in your brief, and I'm trying to reconcile the two. So, I just heard you say to Justice Kavanaugh that particularity requires answering what the CEO knew and when did he know it. That's the rule that you want us to put forward? Those are the most important aspects, again, in a case in which it's based on those types of allegations. You can have other cases. Right, right, right. Okay. And then I think in order to reconcile that with what you have already said in your briefing, you would have to say, and the only way to do that in any case of that nature is to allege the contents of the documents. Because I don't know that you can get away from having said over and over again, including in your question presented, that the allegation of the contents of the documents is important. Yes, you've got to have the details of the documents, and that includes when I say what did the CEO know, the way to answer that is what are the contents of that. You don't need to have the document itself. No, I understand that, but you don't need to append the document to your complaint, but you have to allege the contents. So, your answer to Justice Kagan's hypotheticals, I think, would come out differently because she did not, in her hypotheticals, talk about allegations that spoke of the contents of the documents. Yes, she did. So, remember, her hypothetical, as I understood it, was the CEO gets documents saying our sales are really low and then goes out publicly and says our sales are very high. That was hypo one. Didn't she migrate from that to say that the employees say these kinds of documents are circulated. We know the CEO looks at these kinds of documents, and his statements were different. And if there's details about the documents, then yes, that meets the particularity requirement. So, you have to have the contents of the documents. Or something like the Stevelman case in which you can infer by the CEO's conduct, like if they go and sell their stock personally or something like that. We know there's a very strong inference as to what the document says. I know, but your argument doesn't have the or in it. Your argument says, whereas here, and I'm reading from the summary of argument, a plaintiff seeks to establish scienter by relying on allegations that internal company documents the plaintiff must allege the contents of those documents. Otherwise, the allegations are insufficiently particularized because they do not describe what the documents said. So, I was led to believe from that kind of language that really your rule is you have to allege what the documents say. We think that's basically right because that's based on what those documents are. So, if the allegation is, you know, these documents say X, then you've got to have details. And if we disagree with that, you lose, right? Because that's the rule you're asking for. No, I don't think we lose. I mean, it depends on exactly what you disagreed. But if you said, for example, the timing really matters as it does here, you know, that when question, they lose every day of the week because they can't show any allegations during the class period. Thank you. Thank you, counsel. Mr. Goodman. Mr. Chief Justice, and may it please the court, the PSLRA demands particularity. Everyone agrees you can't circumvent the statute with conclusory allegations or unsubstantiated expert opinions. But that's not what happened here. On falsity, the Court of Appeals holding expressly rested on a combination of facts showing that a substantial part of gaming revenues came from crypto. That mix included former employees' detailed accounts of internal data and meetings, the very similar analysis of the Royal Bank of Canada and PRISM, and Huang's eventual acknowledgment of the crypto hangover, which sent the stock tumbling 28%. On Sienta 2, the Court of Appeals relied on a mix of facts. Executives with direct knowledge of Huang's knowledge attested that the internal data showed 60 to 70% of gaming revenues came from crypto, that other internal data corroborated this, and that Huang personally reviewed that data every Sunday. The court also relied on Huang's public representations about his own knowledge. When analysts repeatedly asked him if crypto was driving gaming sales, he called this wrong, claiming that crypto's effect was, quote, small but not zero. He didn't express uncertainty. He said, we know the market's every move. We are masters at managing our own channel. Under Telabs and Matrix, all of these facts must be assessed collectively and in context, not in isolation, and that is exactly what the court below did. Now, the petitioners haven't identified any legal error in that decision. And while the cert petition and the blue brief initially seemed to propose new categorical legal rules, I think the questions from Justice Kagan, Justice Sotomayor, Justice Gorsuch, and Justice Barrett show that they have retreated to nothing more than a fact-bound application of agreed-upon legal principles. There is no need for this court to sit as a district court and reweigh hundreds of paragraphs anew. If the court does not dig, it should instead reaffirm Telabs and Matrix and affirm. I welcome the court's questions. I understand your argument, but what is your definition of particularity, and how do you think it plays a role in your complaint? I think actually everyone agrees on the definition of particularity. Particularity requires detail, and it's the same concept of particularity that's come down from the common law. Common formulation in the lower courts is you've got to have the first paragraph of a newspaper story, the who, what, why, where, when. So what work does it do in your complaint? So in our complaint, I think it's shot through with detail with respect to falsity, as I just recited, about all of the particular internal information within the company, the market's reaction, why there is good reason to believe that these statements were false. And with respect to Sienter, you can think, I think, of the particularized allegations as the input that goes into the question that the statute asks, which is whether there's a strong inference of Sienter. And we agree with the Solicitor General, and I think petitioners agree with this, that ultimately where it cashes out is does the court have enough particularized allegations in order to assess whether the inference of Sienter is at least as compelling as any alternative inference? But you don't think you have to go as far as an old fact pleading regime in order to sort of meet this definition of particularity? I think that's right. I think that the federal rules of civil procedure still apply. I think Telabs and Matrix make that clear. This isn't a departure from the federal rules, but it is a demanding standard that requires plaintiffs to come forward with detail, detail both with respect to falsity, especially when they're alleging upon information and belief, and then detail that, as I said, allows the court to determine whether or not there's a strong inference of Sienter. You said that a complaint has to have enough particular allegations. As I was asking Mr. Katyal, I think we shouldn't lose sight of the fact that the PSLRI had very particular objectives in mind. And it seems to me if you're using words like enough, it's not clear to me that that's going to allow the statute to be very effective. So how am I supposed to handle that conundrum? This statute, as I said, wanted to accomplish some very specific objectives, and if enough is enough to get over it, it seems to me that the statute might have had more in mind. Well, I think one way to look at what the statute had in mind is that it drew this phrase, strong inference of Sienter from a set of cases in the Second Circuit that represented a very demanding standard. And that said, it's not enough to do what you could have done under Rule 9b. Rule 9b, of course, said that you could generally allege the state of mind, and the Second Circuit's standard was the most demanding standard at that time. Congress used the same words, and so that's one guide to what Congress had in mind. Congress was not, however, I think, saying that circumstantial proof goes out the window. All of those cases from the Second Circuit made clear that that kind of proof is appropriate, and Tell Labs is such a case. Tell Labs is a case, I think that it's sort of a much closer case than this one, much sort of on the opposite end of the spectrum, where the defendants were actually able to accurately say there that the plaintiffs hadn't alleged the contents of the sales reports of the internal data, unlike what we have here. And if you look at the Tell Labs decision on remand, I think that's a good example of how you apply these demanding pleading standards to a circumstance like that. And there, like in this case, you were talking about demand for the company's flagship product. The CEO was reviewing sales data constantly, even though it wasn't alleged with the kind of particularity it's alleged here. And based on the total mix of allegations, it was enough to support a strong inference of scienter. And as I said, it ultimately cashes out on the inferences. And so I think it's worth talking about those, because we struggled in looking at the briefing to determine what are the competing inferences that my friend is putting forward. And I think I can discern three. And I think those competing inferences are, first, NVIDIA wasn't tracking crypto sales. Second, NVIDIA had inaccurate information or miscalculated. And third, Huang might not have known what NVIDIA knew. And with respect to the first one, we know that the complaint is shot through with detail about how NVIDIA was tracking crypto sales. They were doing it through multiple internal databases. There's, you know, verbatim information from internal presentations that showed that they were doing that. I think that inference is hard to credit. Thank you. Could I hear about the other two? Sure. The second is, I think, and I heard Mr. Cotfield say this, that maybe NVIDIA was trying to track crypto sales, but they had inaccurate information or miscalculated. But we have specific data from multiple reliable sources within the company showing a consistent pattern. So we have the sales manager in China who reported that 60 to 70 percent of China sales went to miners based on the centralized sales database that Huang reviewed regularly. And that's confirmed by internal records showing over 800,000 G-Force units sold to miners just in the second quarter of 2017 alone, which is inconsistent with Huang's public statements. We had a witness in Russia who reported that over half of the crypto sales in Russia went to crypto miners and similar reports from other markets like India. And these were not rough estimates. They were specific figures from NVIDIA's own tracking systems across multiple markets, which is another way of saying that if you adopted the rule that I urge you not to adopt, we would satisfy it. And then third, the inference is Huang might not have known what NVIDIA knew. And I think this explanation collapses based on Huang's own statements about his own knowledge, his direct involvement. He reviewed sales data every week, every month and in quarterly meetings that one witness described as proctology exams because they were so detailed. The nature of his responses, I think, is critical here. As I said earlier, when he was asked by analysts about the crypto demand, he didn't say, you know, we don't know or I don't know. He quantified the statements he was making and he didn't express uncertainty. He gave very specific figures that, again, contradicted the data. May I follow up on that? Yes, Mr. Gupta. So if we're going to treat this case as error correction, I got some error correction kind of questions for you. Sure. I imagined you might have. The first is your friend on the other side, Mr. Kotschall, would say that when it comes to the falsity that you're relying predominantly on two former employees, one and two. And five is kind of out of the picture after the Ninth Circuit's decision, for example. And one is five layers below the CEO and in China. And number two left the company right at the beginning of the class period and therefore can't inform what happened thereafter. Would you give me your responses to those? Sure. A few things. I mean, first of all, I think the fact that one of them left doesn't change the fact that his testimony, his statements, tell us in granular detail what Huang's practices were for tracking this information and specifically crypto sales data. So the only way in which it would matter that he left would be if you were to draw the inference that suddenly at the moment when the market is most focused on crypto demand and he's being asked about it at every earnings call and in every interview that he somehow changed his practice and blinded himself to that. So I don't think that really helps about one. And then with respect to one, it is true that he left in December 2017. That's into the class period. Five layers below the CEO, they emphasize. Well, they say that. And that obscures the fact that he was the person in China who had the most knowledge about this issue. He was the person interfacing with the crypto mining enterprises. And we know this because when headquarters was alarmed about the exploding crypto demand, everyone is the person they tasked with looking at all of the data and making this presentation that went to headquarters. The guy who knows the data knows what goes into the sales reports that he sends up the chain. And then you got the other guy saying and the CEO looked at these sales reports with great interest routinely. Yes, at least up until the time I left. Yes. OK. All right. OK. I got it. On the second question, on the expert report, another fact found error correction. Prism relied on, as we've heard, a proprietary model that was undisclosed. Is that a problem? Why isn't that a problem? I think that's just an inaccurate characterization of the report, Your Honor. There was no model. This is basically what Prism was doing was math. It was taking publicly available figures and doing some multiplication. And the math, by the way, is the same math that the Royal Bank of Canada did. And you heard from my friend that there's nothing about the Royal Bank of Canada's calculations. I just do want to point out to the court that the Royal Bank of Canada's report is in the record. It's at docket 124-31. And so you can see that the math there is the same. And this isn't terribly fancy math. It's taking what's called the hash rate, which they haven't contested. That's the measure of the output on these crypto blockchain networks. And Prism did a very conservative estimate. They only took the three most popular blockchain networks that required GPU processing. And then they applied a market share number. And I think when he says proprietary model, what he's talking about is one of the three measures of market share that they used. But that was a firm that NVIDIA itself used for market share data. But they also had two other measures of market share data. And one was based on the internal document that FE1 prepared. That slide. 69 percent. Right, exactly. And so if you had to keep going, sorry. If you want to finish that up, that might turn out to be useful for us. I think that was the main thing I wanted to say about that.  If you had to summarize why you think Judge Sanchez was wrong, how would you summarize that? I think that Judge Sanchez, with all respect to Judge Sanchez, just wasn't characterizing the plaintiff's complaint, or actually the majority's opinion, fairly. Because he seemed to think that the expert report was the linchpin of everything. And the plaintiffs only put forward the expert report as confirmatory. They were going above and beyond because the PSLRA is demanding, and this is sort of belt and suspenders. But if you take the expert report out, it doesn't change the picture of falsity in any dramatic way. It's merely confirmatory. And so I understand that the court may have been persuaded to grant certiorari based on that characterization. But I think the characterization just doesn't hold up. Well, Judge Sanchez thought that the majority had not paid sufficient attention to opposing inferences. You have laid out allegations from which you claim one can infer that Huang knew that what he said was false. But under TELABS, that had to be weighed against competing interests. And as I understood Judge Sanchez's opinion, he said that was not done. And he pointed in particular to figure F. So what is wrong with that? Yeah, I'm glad I have the opportunity to address figure F because this is the basis for my friend's statement that the complaint, quote, eats itself. And I think that's just not so. He's referring to the slide that's at page 62 from the internal China presentation. And the data there actually falsifies Mr. Huang's public statements. So the three bars there on the bar chart, and I realize I sound like I'm in a district court argument, but these three bars are reflecting the sales for the second quarter, the second quarter of the fiscal year 2018. But this is in 2017. And it shows that the majority of sales for two crypto miners are GeForce GPU units. And it also is inconsistent with the public statement that Mr. Huang made about that quarter when asked about the second quarter earnings, that the SKU was capturing the majority of the sales. That isn't true. And then immediately after the period of this slide, the public data released by NVIDIA shows that the OEM segment, the crypto SKU segment, dropped dramatically. And so it's not consistent with the idea that there's a trend in that direction. It's not consistent with the statements that Mr. Huang made publicly. So this slide is actually, this is the thing that they pointed to to help them, but it actually shows in fairly granular detail much more than the PSLRA demands, because we don't have to prove our case in a summary judgment-like fashion. But it shows that the statements were false. Judge Sanchez said that the thought that the slide showed that the crypto SKU was drawing sales away. Among miners, it was drawing sales away from the GeForce GPU. Is that incorrect? I don't think it is. Some of what I heard from my friend is addressing a conspiracy theory that we didn't advance and are not advancing. We are not saying that the crypto SKU didn't capture some of the sales to miners. And we're not saying that the company engaged in accounting fraud in misstating those revenues. It stated those revenues. The problem was that it equated crypto demand with the line item regarding the SKU, which led analysts to be misled consistently to think that there wasn't crypto demand that was driving the GeForce sales, when in fact it was. So I'm focused a little bit on the demands of particularity at this stage. In part of your response to Justice Alito right there, you said, we don't have to prove our case in a summary judgment-like fashion. And that's what I thought. But I'm just wondering whether that's actually the case. The Chief Justice asks, well, what was the point of the PSLRA? And is it possible that the PSLRA was really, with its particularity requirement, demanding that plaintiffs have the kinds of evidence that would be necessary to demonstrate the inferences that they would want the court to draw? So I think this court, Intel Labs, rejected exactly that argument. And I don't understand my friend to be asking you to overrule that portion of Intel Labs. So Intel Labs holds that we don't have to meet a summary judgment-like standard or present more proof than we would need to present at trial. Now, I think if this were a district court and we were having a summary judgment argument, I'd like our chances because we have quite a lot of evidence. And I appreciate that. But I guess I'm just trying to understand what the standard is. So if you don't have to demonstrate through the presentation of evidence that your inferences are correct or that you have enough evidence to show a jury that your inferences are correct, then what is the work of particularity? I mean, your colleague on the other side suggests that you do have to have enough detail about the contents of the documents in order to do something. But I can't separate that out from saying you have to have the documents themselves in some way. I think this colloquy shows the wisdom of the court's consistent refusal to adopt bright-line rules. I acknowledge that there are going to be some cases where the plaintiff's failure to allege the contents of documents is going to be fatal. But there are going to be a great many cases in which there's a holistic analysis of all of the mix of facts where that's not necessary. And I think actually TELL Labs on remand and matrix are two such cases. Thank you, counsel. If I could just pick up on that point. In requiring particularity, the PSLRA was at least raising the bar when you talk about, you know, you have to have some evidence of this or that. Congress went out and saw a real problem there and wanted to do something about it. So the idea that, oh, you're going to have varying levels of particularity with respect to the evidence is kind of a hard standard to apply. I mean, if it is just, oh, you look, you know, it's a case-by-case basis, and we're going to have to wait for 25 or however many years until some general rule is distilled, it doesn't seem to me that the statute is doing what they meant it to do. Well, I think the statute is doing what they meant it to do, and I think the proof is in the lower court jurisprudence. I think if you look at all of the cases cited in the cert petition, we don't really have any quarrel with those cases. They are engaging in a fairly fact-bound analysis in each of those cases about whether the rules of particularity are met, and it's not easy. This standard is not easy to meet. My friend is right when he said that this is a standard that is different from the typical standard, and that's why you get complaints that take up as much of the joint appendix as this complaint does. Well, I'm not sure what they were looking for is verbosity. Fair. Fair. I hope not, anyway. Yes, and in fact, there are some cases where the courts are saying your complaint is too long. So I think it's not just length. It has to be detail, and it has to be detail that is sufficient, as the court said in Telabs, to negate or at least to show that the inferences are as compelling as any competing inference. Thank you. Justice Thomas? Justice Alito? Do you think that motive has any role to play in the analysis of scienter? I know you don't have to prove motive. Do you think it's relevant? Yes, I think this court has said that it's relevant but not necessary. I mean, if the real figure is $1.5 billion or over $1 billion, and Mr. Huang says, no, it's $100 million, what motive could he have for making a statement that is so far off, and that is, if you are correct, if the over $1 billion figure is correct, is surely going to come to light with severe consequences? That's the argument my friends make, and I think you could have made exactly the same argument in Telabs, where it was pretty clear to everyone that nobody wanted this product, and the new product wasn't going to suffice. You could have said very much the same thing in Matrix, where it was clear that this nose spray caused people to lose their sense of smell, and everyone was starting to figure that out. In this case, however, I think that Huang might have thought what a lot of people think when they're carrying out a fraudulent scheme in the Ponzi scheme, for example, which is that people might not find out and the reality might not catch up with them. And just imagine that the crypto crash had happened a bit later. NVIDIA is now a company whose sales rely on the need for these chips for artificial intelligence. If that artificial intelligence demand had arrived a little bit earlier, and the crypto crash had happened a little bit later, this fraud would not have been recognized and there would not have been the crash, and so he may have been relying on precisely that kind of hypothetical scenario. So I was struck by the SG's answer, well, it's like a Ponzi scheme, and you really don't have a better explanation. It's a Ponzi scheme. This gigantic company with highly sophisticated officers is engaging in a Ponzi scheme? I don't think we're saying that it was a Ponzi scheme, and I don't think that's how I understood the Solicitor General's brief as well. It's that you could say the same thing in a Ponzi scheme case, and you could say the same thing in many securities fraud cases, including the two cases that this court has had under the PSLRA. Justice Sotomayor? Counsel, I see two purposes, there may be others, to the PSLRA particularity requirement. It has two purposes, I think. To ensure that defendants know exactly what to defend against, and to prevent frivolous lawsuits. The allegations in this complaint are pretty clear. They have to defend against whether crypto mining was driving their business during the class period, correct?  And to defend against it, all they have to do is show the sales records that all of these employees say exist, correct?  Mr. Kuchel seemed to suggest in his responses to one of my questions, I think it was, that the SEC has those records? Are you aware of the SEC? You don't have them. I don't have them. You know, I think it's important to understand that the SEC's enforcement action, and the government can speak to this, was just about focused on the disclosures made to the SEC. And that's not uncommon, that's understandable. They were focused on what NVIDIA had told the government. So it wasn't the subject matter of this case, which spans a whole range of statements made over a longer period of time. What happened to that SEC case? The SEC, NVIDIA settled with the SEC case, they were fined. With no admission of liability? They did not admit liability, but I think attached to the red brief is the cease and desist order from the SEC. And just to be clear, you don't have whatever records the SEC got. If it got the sales records or not, we don't know. If we do not have those, we would need a discovery. The government would probably tell us that. Okay, thank you. Thank you. Mrs. Kagan? If I could just go back to the questions that Justice Alito asked you, because it strikes me that from your answer, the Ponzi scheme is actually a bad term for what you're suggesting. The Ponzi scheme is that you're never going to get caught up. Right. And it's just dishonesty after dishonesty after dishonesty to try to hide that fact. But you're not suggesting that. You're actually saying that if things had worked out a little bit differently in the market for crypto and in other markets that NVIDIA was involved in, NVIDIA is now the company that's sending the stock market into the stratosphere, we would never have known about this. So Mr. Wong might have been making a pretty good bet here. Exactly. And your answer is much better than mine was. Right. Exactly. I think there's a difference between someone who's carrying on a scheme where it's inevitable that they're going to get caught and someone who is rationally calculating that the market might not catch up to what they're saying. I'm sorry. Justice Gorsuch? How much money is at stake in this case? In other words, if you were to prevail ultimately in the class? Not as much as it might seem because I don't want the court to get the impression that this enormous delta of sales is what's at issue. What would be at issue would be you would have to show loss causation and materiality. What are you seeking? Like if you ran the table, what are you seeking roughly? I don't know what the numbers are, Your Honor, but I think people were harmed because imagine somebody whose retirement savings were in NVIDIA and they sold the stock at the time of the crash and they were harmed. Now, there may be other people who wrote it out and weren't harmed and don't need any relief. So you don't have any idea how much you would be seeking? I don't know the answer to that. The concern, I think, raised by the amici is the fraud by hindsight. You've heard Mr. Cocciola, and I just want to get your chance to respond. The idea is the effects on the American economy. If businesses' income or stock price falls, you can get an expert, you can get passed a motion to dismiss, and that has a, as you read in the amici, you know all this, but has a significant effect on the American economy. And that while it's painful for us to get into the facts and have to actually dig into the facts, the Ninth Circuit opinion, so the amici say, is a blueprint for getting past the motion to dismiss in a way that's contrary to what Congress thought and will have negative effects on the American economy. And it's our role to make sure that we have policed the lines that Congress drew so that the economy is not harmed. So there are a few questions in there. I think, first of all, with respect to your role, I think the court's role is, you know, Congress's role is to balance these competing objectives about needing meritorious suits to discipline capital markets and ensure that there aren't frivolous suits that are a drain on the economy. Congress struck that balance with this statute. They wanted meritorious cases to go forward like this one. They did not want the kind of thing that Judge Friendly was describing, and my friend is right about this, where you had what was called fraud by hindsight, where, you know, a stock goes down, the day later, you know, plaintiff's lawyers who are not representing institutional investors file a lawsuit without any investigation. Those kinds of cases where, you know, they're looking for a theory of fraud without any information, those kinds of things are what the PSLRA was intended to root out. And appropriately so, because Congress did strike a balance. Congress recognized that there is a value to having private securities litigation as a supplement to public enforcement to ensure that our capital markets are the best in the world, that they are efficient, that they are honest, that people can rely on our stock markets. If Judge Sanchez's opinion had been the majority opinion, would you have sought cert? I probably would have been very upset, but I probably would have counseled my clients that this is a fact-bound disagreement about settled standards.  I wouldn't bind yourself like that. But anyway, thank you. Justice Barrett. Justice Jackson. Thank you, counsel. Thank you. Ms. Sinstrack. Mr. Chief Justice, and may it please the Court. To resolve this case, the Court does not need to create any new one-size-fits-all rules. Instead, it can simply reiterate a few basic principles that flow from the plain text of the PSLRA. And the good news is, I think we're all agreed on those basic legal principles. So first, as to CENTER, the PSLRA requires a plaintiff to plead enough particularized facts to create a strong inference of CENTER. Particularity means detail. But the particularity requirement doesn't say anything about what kind of details the plaintiff has to plead. So long as she pleads enough details to make the inference of CENTER at least as likely as any competing innocent inference, then she has cleared the PSLRA's bar. And we think that happened here. Second, as to expert reports, the PSLRA does not mention them at all. So they're neither disfavored nor are they preferred. It's just that the same basic standards apply. So if a plaintiff is relying on facts drawn from an expert report, they have to be pleaded with particularity. And if the plaintiff is relying on a belief, is making information and belief pleading, then it needs to plead the particularized facts supporting that opinion, that belief. Again, we think that's the standard the Ninth Circuit applied here. And so all the court needs to do is reiterate these principles and affirm. I welcome the court's questions. Do you think particularity is used in the same way it's used in Rule 9b of the Federal Rules of Civil Procedure? Yes. I think it looks like it was taken from that. Congress was taking it from that. And I think that's a good point, perhaps, to what the Chief Justice was asking about before. What did the PSLRA do? Rule 9b says that you have to plead facts with particularity. It creates an exception for CNTR, and then the PSLRA effectively takes that exception away. So I take it you think the PSLRA was intended to do a good bit more than simply keep out frivolous lawsuits? I think it definitely was intended to keep out frivolous lawsuits. I think there was a competing intent to ensure that meritorious lawsuits would go through. No, but my question was, do you think it was intended to do more than simply keep out frivolous lawsuits? I think that was the primary purpose, but I may not be understanding your— Well, you said it was designed to ensure adequate allegation of CNTR, that it imposed a heightened particularity standard, all those other things that you listed. Sure. I think I was thinking of those as means to the end of keeping out frivolous litigation and of raising the pleading standard. But, yes, I certainly think that those were the specific things that Congress did within the PSLRA. Okay. Ms. Sendak, so let's say that we don't adopt for CNTR this bright-line rule. Mr. Katyal suggested that for the comparative standard, at least as cogent and compelling as the alternative, that the Ninth Circuit, while parroting the rule, didn't adequately apply it. It seems to me that if we rejected the bright-line rule, we could either affirm, as you suggest, or perhaps—I'm not saying we do, but if we agreed with Mr. Katyal, we could vacate and remand and say you stated the right standard, but you didn't adequately apply it. Does the government really have a dog in that fight, and if so, why? Not really, except that we do think that the Ninth Circuit correctly applied the standard here, and what we wouldn't want is there to be confusion, because if the court reiterates the standard, but then remands, there might be some suggestion that the Ninth Circuit did something wrong, and courts might be a little bit confused about what it is that they did wrong. And, again, we think that if you look at the Ninth Circuit's decision, it really was fulfilling this requirement. And I think, you know, 42A is the place where the Ninth Circuit sort of talked about all of the different things that it relied on to find the enter here, and I do think it articulates the Pell Lab standard. Do you think that the settlement with the SEC has any legal relevance here? I think only marginally in that the SEC did make findings, including, you know, this is a finding that NVIDIA had information indicating that crypto mining was a significant factor in the year-over-year growth revenue from the sale of GPUs. So the SEC made that finding, but NVIDIA did not admit that finding, so this isn't in the nature of an acknowledgement. I think, you know, it's one fact that might make it slightly more plausible. Well, would it be admissible if the case were tried? It would not be admissible in terms of any – it's not a – it's not the – pardon me – it's not acknowledgement. I just wondered why you mentioned it. Just to dirty up NVIDIA? Oh, in our brief? In your brief, yeah. I think primarily because the parties had mentioned it, and we just wanted to be honest about it, but I think you'll note we mentioned it in our statement. Thank you. We didn't talk about it in the argument. Mr. Kuchel, then, I may have totally misunderstood him, but I thought he said that whatever he gave to the SEC proved his case and not his opponent's case. The only publicly available information about the settlement is what we have – what was attached to the red brief and what – in Westlaw, it's cited at page seven of our brief. What the SEC had in terms of documents is not publicly available. I'm not sure whether Mr. Kuchel was talking about what his clients gave them. I just – I don't know that. It's not publicly available. But whatever he said the documents showed is not anything that you're prepared to say they showed. No. Other than what you read. Yes. Excuse me. I completely agree. So what the SEC's findings are are embodied in this settlement agreement. You answered the chief by saying there was one purpose for those lawsuits. I thought there was a second purpose, which was to ensure that defendants knew what they were defending against. That's right. It is also – so there's – I think some of the amicus briefs on respondent's side point out that, in general, particularity requirements are to assist with notice. And so I think that's there. And maybe just, Mr. Chief Justice, to return to your question, if what we're talking about is the frivolous, that it's more than – this is doing more than Rule 11, I would certainly agree with you there. Counsel, you can end it answering me. Oh, sure. If the dissent had been the majority, what problems would have been created going forward from your perspective? If the dissent had been the majority, I think, honestly, what we have is a disagreement on the facts. So that goes to your answer to Justice Barrett's question, it sounds like. Yes. I mean, I think that it would have a profound effect on this case, but I'm not sure that it would set bad law going forward. I think that just to touch on a few things very briefly that have already come up. In terms of how to handle expert reports, Justice Alito, I think you said that it may be difficult for district courts to know what to do with these very technical sets of facts that you'll find in expert reports. That's going to be the same problem if they're not in expert reports, and they might even be more confusing, because I think if you have plaintiff's lawyers trying to articulate a bunch of highly technical facts, it might come out a little bit more garbled. So I don't think that's a particular reason to adopt a special rule, and the PSLRA does not. Justice Kavanaugh, I think you asked about the Ninth Circuit applying different rules, and I really don't think that they are. And the best evidence, perhaps, of this is that Anderson, the case that petitioners cite and rely on as doing it right, is repeatedly relying on Ninth Circuit precedent. And I'd also note that the district court decision, which, again, petitioners are relying on, that also is repeatedly relying on Ninth Circuit decisions. So I don't think this is a case where the Court of Appeals has gone rogue and is doing anything different than the other courts of appeals here. And in terms of the slide, the main thing that I want to say there is that the Ninth Circuit did address the slide. I think that this court is not a court of factual analysis, but if you're concerned that the Ninth Circuit just wasn't doing things, there's many pages of analysis from 48A to 55A explaining that they were examining that. And similarly, there's many pages of analysis examining the detailed factual allegations underlying the expert report. That's 20A to 22A. So unless there are further questions. Thank you, Counsel. Rebuttal, Mr. Katyal. Thank you, Your Honor. Five points. First, Mr. Gupta said that particularity requires detail. We quite agree, yet the Ninth Circuit said that this complaint had enough detail. This is why you need to reverse. It's dangerous to say this amount of detail is enough for a complaint. That's not a change in our position. I'll explain that in a moment, but they're the ones changing their position. They are running away from the Ninth Circuit. The Ninth Circuit's decision said that the CEO, quote, would have reflected their expert opinion and does not engage in any sort of comparative analysis. 42A is not a comparative analysis. The Ninth Circuit never even bothered answering our competing hypothesis, which was the pricing explanation. You have to reverse that. And as the amici say, otherwise you're letting circuit courts let the litigants provide these cases and state a claim without a comparative inquiry. And you certainly have to reject their new idea that these employees are enough because they don't indicate when the CEO knew something. Was it after or before that Watershed SKU event? Nothing. They do say that the CEO actually saw the data at the time. The best they have is a video that was taken from 2012, well before the class period. And Judge Sanchez explains at 62A why that slide is so devastating. And he also explains at 82A why not a single employee ever said the CEO saw anything damaging during the class period. You can't let this stand for the reasons the amici say. Congress and the Reform Act, as the Chief Justice indicated, wanted to stop lawsuits like this, lawsuits that allow fraud by hindsight. Second, Justice Jackson, our rule is that if they are relying on documents, they then need to allege the contents. If they aren't relying on those documents, they don't have to. And I understood Justice Kagan's second hypothetical to be relying not on internal documents, and if so, they don't need to provide the details. Now, our rule has always been the same. It's the rule found, for example, at page 31 of our brief, when a plaintiff omits the most critical aspect of an allegation about a company's internal documents, the contents of those documents that support the plaintiff's claim, the allegation cannot be particularized, citing the Fifth Circuit case. The Solicitor General's rule at page 18 of their brief is very similar. We think both of those would require reversal. Fourth, picking up on the Chief Justice's point, Congress and the Reform Act said maybe is not good enough, that SIENTA requires a strong inference, and yet at the end of the day, all you've heard from my friend on the other side is a series of maybes. Maybe there were documents that contradicted the statements about dependence on crypto. Maybe Mr. Wong looked at those documents. Maybe he looked at them before his public statements. And maybe he deliberately misstated sales. Each of those is just a percentage chance, and taken together, they don't come close to being the kind of SIENTA inference that is at least as compelling as the competing alternative. Judge Sanchez on this point is devastating, as Justice Alito was picking up on. Why would it make any sense for a CEO to act this way? In the context of the Reform Act, maybe doesn't cut it, and that's especially true here, when their whole theory about motive makes no sense whatsoever. Mr. Wong is not running a Ponzi scheme. We're talking about one of the most respected CEOs of a dramatically important company, and there is nothing that ever answers why he would act this way when he is saying time and again the pricing data shows that they can't track end users. Finally, this gets a little abstract, but let me make it concrete. You heard today in the red brief at page 13, says Mr. Wong, quote, continuously tracked in my inventory in the channel. That statement illustrates why details matter. Consider the who. Mr. Wong never said that statement. It was made by someone else. Consider the when. It was made in 2007, before cryptocurrency was even invented. This is a good illustration of why details matter, why what the district court did here by going allegation by allegation and interrogating it to make sure that the details support the story are there. That's what allows the court to get past the competing inference that Tell Labs requires. That's precisely what the Ninth Circuit had missing on every page of its analysis. Never did they deal with the competing explanation that the company offered, that prices were remaining high because of independent actions by retailers. Had they done that, if the complaint had provided that level of detail, that would be one thing. This complaint doesn't, and that's why it's so dangerous, as the amici say, to let a case like this lay and pick up and allow litigants in the future to pick up and get past the state of claim barriers. Thank you, counsel. The case is submitted.